1  STEPHANIE M. HINDS (CABN 154284)
   Acting United States Attorney
2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  ERIC CHENG (CABN 274118)
   FRANK J. RIEBLI (CABN 221152)
5  Assistant United States Attorney

6      450 Golden Gate Avenue, Box 36055
       San Francisco, California 94102-3495
7      Telephone: (415) 436-7200
       FAX: (415) 436-7234
8      Eric.Cheng@usdoj.gov
       Frank.Riebli@usdoj.gov
9
   Attorneys for United States of America
10
                            UNITED STATES DISTRICT COURT
11
                           NORTHERN DISTRICT OF CALIFORNIA
12
                                  SAN FRANCISCO DIVISION
13

14 UNITED STATES OF AMERICA,            ) Case No. CR 21-121 JD
                                        )
15         Plaintiff,                   )
                                        ) UNITED STATES' MOTION TO DETAIN
16    v.                                ) DEFENDANTS RUSH AND MIKSCH
                                        )
17 JESSIE ALEXANDER RUSH, and           )
   KENNY MATTHEW MIKSCH,                )
18                                      ) Hearing:  April 14, 2021
           Defendants.                  ) Time:     10:30 a.m.
19                                      ) Court:    Magistrate Judge Corley
                                        )
20

21

22

23

24

25

26

27

28

GOV'T MOT. TO DETAIN
CR 21-121 JD

## I. INTRODUCTION

A grand jury in the Northern District charged Jessie RUSH, Kenny MIKSCH, and two others with conspiracy to obstruct justice by destroying evidence in an official proceeding, and with destroying evidence in official proceedings. Though on the surface the charges appear to be "paper" crimes, the evidence the defendants destroyed related to a murder investigation and their own discussions and preparations for acts of violence against law enforcement—as the leaders of an armed anti-government militia group. And the essence of their obstruction offenses is a complete disregard for the rule of law. For the reasons set forth below, neither RUSH nor MIKSCH is amenable to supervision and they should each be detained pursuant to 18 U.S.C. § 3142.

## II. FACTS

### A. RUSH and MIKSCH Were Part of a Violent, Anti-Government Militia Group.

Jessie RUSH, Robert BLANCAS, Simon Sage YBARRA, and Kenny MIKSCH were all members of an armed anti-government militia group called the "Grizzly Scouts" ("Grizzlies"). RUSH organized the Grizzlies and was the group's commanding officer. He gave himself the rank of Major. He made MIKSCH and BLANCAS lieutenants, and YBARRA a corporal. RUSH recruited several of the Grizzlies' members, including BLANCAS, YBARRA and MIKSCH, through a Facebook group he created. On the group's front page, he stated the group's association with so-called "boogaloo" extremists:[1] "they say the west won't boog, were [sic] here to gather like minded Californians who can network and establish local goon squads".

Indeed, the "Grizzlies" discussed, trained, and prepared for violent confrontations with the government and attacks on law enforcement. In May 2020, for example, the Grizzlies prepared for an operation at a protest in Sacramento. In advance, they distributed an "Operations Order" that identified law enforcement as "enemy forces." They also established a so-called "QRF," or a Quick Reaction Force subunit, that included RUSH and MIKSCH, in the event that the man they sent into the protest ran into trouble. The QRF's job was to rescue the recon element. QRF members were required to carry a

---

[1] As explained in the indictment, "boogaloo" is a term sometimes used by certain militia extremists to reference a politically-motivated civil war or uprising against the government. The "boogaloo" is not a single cohesive group, but rather a loose concept, which has become a rallying point for some extremists.

rifle and pistol and extra magazines.  They also considered the possibility of taking prisoners at the event.  As the operations order stated, "POWs will be searched for intel and gear, interrogated, stripped naked, blindfolded, driven away and released into the wilderness blindfolded with hands bound.  We will not execute POWs; however, we will not render medical aid to enemy WIA [wounded in action]. Enemy WIA will be given some water, searched for intel, interrogated, depending on nature of injury driven to the wilderness or left to their god."  In other words, the best outcome for a police officer the Grizzlies captured would be getting stripped naked and dumped in the wilderness, blindfolded and bound, quite possibly to die.

Towards the end of May and beginning June, the Grizzlies' discussions of attacks on law enforcement matured.  Between May 26 and 27, 2020, YBARRA and another Grizzlies member began to discuss plans.  YBARRA wrote, "I feel it.  I partially just want a concrete plan".[2]  "I feel like that one had some holes", he said.  The man YBARRA was communicating with said his vision was "cartel style."  YBARRA responded, "Bro we have to talk about this in person".  "There needs to be a protocol in place, and it needs to be done a certain way.  We can talk about this and reach an understanding about how this needs to work."  They met behind a gas station in Los Gatos, near YBARRA's home, and sat in the man's van and assembled an assault rifle.  The day after that, May 28, 2020, the man contacted YBARRA about attending a protest in Oakland the next day, on May 29, 2020, to "snipe some you know what's [sic]."  YBARRA does not appear to have responded, but the man is alleged to have ambushed two federal protective service officers that night, killing one and wounding another.  That murder and attempted murder are charged in a separate federal case arising out of that incident.

At the same time YBARRA was discussing plans to attack law enforcement with that man, he was also reporting those conversations to RUSH.  On May 26–27, 2020, he told RUSH that he had spoken with the man and that he "just wanted to make sure we are on the same page, and that targeting innocents doesn't fly with me even if they are wearing a badge."  RUSH agreed, but added, "yea we need to actually develop targets and cases, be smart. They want war, then we bring em war."  In other words, it wasn't the idea of killing people that RUSH or YBARRA opposed, they just didn't want to kill

---

[2] When quoting a complete text message that lacked punctuation, we end the quotation where the text message ended and put the punctuation mark outside the quotation mark.

GOV'T MOT. TO DETAIN         2
CR 21-121 JD

purportedly low-value targets. RUSH confirmed this a moment later: "we can start developing case files, gathering intel, and doing it just like big bro does" "im not about the fireworks" "im more like a surgeon". RUSH also said "the gov spent 100s of thousands of dollars on training me, im gonna use that shit", meaning that he was going to put his military training to use in planning their attacks.

Beginning June 1, 2020 – just three days after the shootings in Oakland – the Grizzlies ratcheted up their preparation for attacks on law enforcement.[3] Another member sent the group a link to an article about the President considering whether to invoke the insurrection act in response to the nationwide protests in the wake of George Floyd's death. "[T]hat ^^^ will be our sign," RUSH told them. "That effectively means the federal gov has declared war in things they're afraid of. Anything like this or a move that resonates with this is our trigger point. If y'all aint giving with that bail now", he said. In other words, RUSH was preparing the group for war against the government if the government invoked the Insurrection Act, 10 U.S.C. § 252. Again, RUSH told the group, "Get right with your gods, families and selves." "If you weren't ready, I sure as hell hope you fake the funk good," he added. "This is unfortunately one instance where fake it till you make it doesn't cut it," MIKSCH responded. "Fake it till you dirt nap", BLANCAS added. "I think it's time to swap your plates bud" RUSH told MIKSCH, meaning, it was time for MIKSCH to put heavier-duty protective plates in his bullet-proof vest.

By June 3, 2020, the Grizzlies began to discuss whether it would be better to provide aid to "Antifa" groups to encourage them to attack law enforcement first, then open their own campaign of violence against a (presumably) weakened police force. "It's the tactically sound option", BLANCAS said. "Them fucking each other up only helps us", he added. YBARRA said he thought aligning with those groups "would be short-sighted." "I don't want to get taken out of the fight before shit kicks off just because I engaged in a psy-op", he said. But one member went on to say "Tactically, we should be yeeting solo cops and taking their shit" and BLANCAS insisted that "Them fucking each other up only helps us". In response, YBARRA gave a thumbs-up emoji. Step One, as BLANCAS saw it, was "Antifa" and police engaging in armed confrontation. "[S]tep two, cops win. Third step is we start yeeting cops when they're done. I'm also totally down with disguising ourselves as antifa and [yeeting]

---

[3] It is unclear whether the other Grizzlies knew at that point that one of their members may have been behind the shootings in Oakland on May 29, 2020.

GOV'T MOT. TO DETAIN                                    3
CR 21-121 JD

some cops that way", he said, meaning that he was willing to pose as member of "Antifa" and kill police officers as a way to kick off an all-out confrontation between the police and those groups.

Throughout these conversations, one of their members advocated openly for attacking the police immediately. None of the other Grizzlies, including the defendants here, disagreed with him – to them, it was a question of "When," not "If." Three days later, on June 6, 2020 in Santa Cruz County, that same man is alleged to have gotten into a shootout with sheriff's deputies, killing one and wounding another. In the moments leading up to those shootings (which are the basis for pending state murder and attempted murder charges), the man communicated with the rest of the Grizzlies, asking them to come to his aid. The Grizzlies generally responded that they were too far away to get there in time, and advised him to delete the data on his phone and try to get away to a safe place where they could pick him up. MIKSCH – who later admitted to agents that he and the group generally listened to police scanners – notified the group that "they," meaning the sheriff's deputies, "have a dog," meaning a police K9 (which the deputies in fact had), but that he didn't think it was a planned raid because "[t]rue raids are usually done at like 3-4" in the morning. RUSH agreed. But the man seemed to believe the deputies were there for him. "Dudes I offed a fed" he told the other Grizzlies. RUSH's first response was to tell the man to erase the evidence on his phone and "exfil," meaning, evade capture.

Sheriff's deputies captured the man later that day, but the defendants moved quickly to destroy evidence. They erased from the previous group communications in which they discussed and planned to attack police from their phones, including the statements described above, and BLANCAS destroyed files related to the Grizzlies' operations. As BLANCAS told YBARRA a month later, "We burned tf [the fuck] out of everything" "All physical files I had were literally burned". But contrary to what they would all later tell FBI agents, the Grizzlies didn't disband. They just switched to a different communications platform, one they thought would be more secure.

Nor did they appear chastened by the fact that one of their members could be involved with these officer shootings. Instead, in text messages the day after the second shootout, it was clear that they were mad at him for making it more difficult for them to operate as a group, but not for allegedly killing police officers. "He removed our platform and robbed our message", RUSH moaned. "Unfortunately we would almost have to wait for the next one," he said, meaning the next opportunity to spark civil

war, "Which is disgusting".  RUSH got over his heartache quickly though – within a couple weeks, he began contacting other Grizzlies and recruiting them to join him on the new communications platform. "Jump on [another communication's platform] if you miss us were [sic] reinventing and if you wanna be apart [sic] of it we'd love to have you back" he told one member.

### B. Agents Seized Weapons and Tactical Gear from the Defendants' Residences.

On August 6, 2020, agents from the Federal Bureau of Investigation ("FBI") executed search warrants at several locations, including RUSH's, BLANCAS's, YBARRA's, and MIKSCH's residences and vehicles.  They seized numerous assembled and disassembled weapons, including the following from RUSH in Turlock:  three pistols (one of which had an extended magazine), a disassembled assault-style rifle,[4] numerous high-capacity magazines and ammunition for the pistols and assault rifle, a plate carrier with armor plates (i.e., a bullet-proof vest), a helmet, a knife and a radio.

Agents also seized the following from MIKSCH in San Lorenzo:  flash-bang grenades, numerous rifle and pistol magazines (including one 30-round rifle magazine), crowd dispersal devices (rubber bullets and a grenade that spread a chemical irritant), a disassembled assault-style rifle, body armor and a helmet, two assembled pistols and one disassembled pistol, holsters, binoculars and tactical belts, and several hundred rounds of rifle and pistol ammunition.

Agents also seized RUSH's and MIKSCH's cell phones.  Subsequent examinations of those phones showed that they were the same devices RUSH and MIKSCH were using on June 6, 2020, when the Grizzlies were communicating with their member who allegedly engaged in a shootout with sheriff's deputies—but those communications were erased from their phones.

### C. The Arrests and Prior Proceedings.

The grand jury indicted RUSH, BLANCAS, YBARRA, and MIKSCH on the present charges on March 23, 2021.  On April 8, 2021, agents arrested RUSH and MIKSCH.  Both men made their initial appearances the next day and the Court set detention hearings for April 14, 2021 upon the government's motions for detention.  *See* 18 U.S.C. § 3142(f) & (f)(2).  Pre-Trial Services prepared reports in advance of the detention hearings.  The government disagrees with those assessments for the reasons below.

---

[4] Some people believe that keeping an assault rifle disassembled evades California laws prohibiting the possession of assault rifles.  The rifles can be reassembled in seconds.

GOV'T MOT. TO DETAIN  
CR 21-121 JD

5

## III. DISCUSSION

### A. Legal Standard

The Bail Reform Act of 1984 permits pretrial detention where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where the defendant is either a danger to the community or a flight risk; it is not necessary to prove both. United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985). The government must prove danger by clear and convincing evidence, and flight risk by a preponderance. 18 U.S.C. § 3142(f)(2)(B); Motamedi, 767 F.2d at 1406. Categorical grants or denials of bail—untethered from an individualized determination—are impermissible. See United States v. Diaz-Hernandez, 943 F.3d 1196, 1199 (9th Cir. 2019).

The Court considers four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); United States v. Winsor, 785 F.2d 755, 757 (9th Cir. 1986). Considering factors outside of those set forth in Section 3142 is disfavored. Diaz-Hernandez, 943 F.3d at 1199.

### B. RUSH and MIKSCH Destroyed Evidence Related to a Murder Investigation and Prosecution.

The grand jury charged RUSH and MIKSCH and their co-defendants with conspiring to obstruct justice by destroying, and destroying, evidence that related to their fellow Grizzlies member's alleged involvement in a murder, and which revealed their own preparations to commit acts of violence, to impair their availability and integrity for use in official proceedings.

The facts underlying the offense and the strength of the evidence weigh in favor of detention, showing both that RUSH and MIKSCH are not amenable to supervision and that they are a danger to the community. First, joining a conspiracy to obstruct justice and attempting to obstruct justice are serious

crimes that demonstrate a total disregard for the rule of law, and that disregard of the law further indicates that RUSH and MIKSCH are not amenable to supervision. Second, the way in which RUSH and MIKSCH obstructed and attempted to obstruct justice is especially concerning because they were attempting destroy evidence of an alleged murder. Whatever legal trouble that man had caused himself, they sought to ensure it would not impede their preparations for further violence. The nature and circumstances of the offenses weigh in favor of detention.[5] 18 U.S.C. § 3142(g)(1).

The evidence of their guilt is also strong: the FBI recovered those communications from their fellow Grizzlies' phone because he didn't have time to delete them before he allegedly engaged sheriff's deputies in the second shootout, but the entire communication is gone from the defendants' phones – the same phones they were using when they exchanged those messages. *See* 18 U.S.C. § 3142(g)(2). Moreover, their subsequent messages to others confirm what they did, and their use of the word "we" shows it was a concerted effort. Though the weight of the evidence is the least important of the factors the Court considers, Motamedi, 767 F.2d at 1408, because the Court is not to pre-judge guilt at the detention stage, id. and 18 U.S.C. § 3142(j), it is nonetheless relevant to the Court's consideration of whether the defendant is a flight risk or a danger, Motamedi, 767 F.2d at 1408. This factor also weighs in favor of detention.

### C.   RUSH and MIKSCH Do Not Recognize the Government's or the Court's Authority.

The Court also considers RUSH's and MIKSCH's history and personal characteristics. 18 U.S.C. § 3142(g)(3). As an initial matter, RUSH's and MIKSCH's membership in an anti-government militia is very relevant to the Court's assessment of their character and amenability to supervision. The Court routinely considers this kind of information in making bail determinations. See, e.g., United States v. McGibney, 2020 WL 4746179, at *3 (N.D. Ind. Aug. 14, 2002) (ordering the detention of a boogaloo extremist with a distinguished record of service in the United States Marine Corps and no prior criminal history, and stating, "True, being a Boogaloo is not illegal. Nor is it illegal to harbor anti-

---

[5] RUSH and MIKSCH might argue that owning guns, dangerous weapons, and tactical vests and planning to overthrow the government are protected activities. Indeed, MIKSCH's attorney has made such arguments to the media, claiming this is a prosecution for exercising rights to assemble and speak, and the right to own firearms. To the contrary, the defendants are not being prosecuted for what they said or who they associated with, but for what they did. And what they did was obstruct a murder investigation and prosecution, covering up their own involvement in preparations for violent acts.

GOV'T MOT. TO DETAIN                                                7
CR 21-121 JD

government sentiments.  But the Court is not determining guilt or innocence at this point.  Rather, it is taking stock of Defendant's history and characteristics.  The Court finds that membership in an organization that advocates for a second civil war, killing law enforcement along the way, speaks poorly of Defendant's character.  Accordingly, this factor weighs in favor of detention.").  See also United States v. Jenkins, 2017 WL 2985408, at *4 (M.D. Tenn. Jul. 13, 2017) (membership in the Gangster Disciples criminal street gang relevant to the court's assessment of the defendant's dangerousness); United States v. Digiacomo, 746 F. Supp. 1176, 1182 (D. Mass. 1990) (membership in the Mafia relevant to consideration of defendant's dangerousness and risk of non-appearance).  Indeed, surely if RUSH and MIKSCH had been volunteering their time with an organization that benefited the community they would ask the Court consider that in evaluating their suitability for release.

      Here, RUSH and MIKSCH's membership – and leadership – in an anti-government militia group that prepared for violent attacks on law enforcement demonstrates a special risk that the defendants are not amenable to supervision and nonappearance because they do not recognize the Court's authority.  As RUSH's and MIKSCH's co-defendant, YBARRA, told their other co-defendant, BLANCAS, "IDGAF [I don't give a fuck] if a judge signs a piece of paper excusing the infringement of my rights, it is still an infringement and should be treated as such".  This distinguishes RUSH, MIKSCH, and the other Grizzlies from an otherwise similarly-situated defendant, and makes them even harder to supervise.  Indeed, the ethos of groups like the Grizzlies is that they alone claim to decide which laws or restrictions are valid.  And here, RUSH set up the group, gathered fellow extremists, implemented a training regimen that MIKSCH implemented, and both endeavored to make them a greater threat by their union than any of them would have been alone.  The Court can and should consider this when evaluating RUSH's and MIKSCH's character, and the likelihood that they will abide whatever restrictions the Court might impose on them.

      At bottom, it is true that RUSH has no prior convictions and has resided most of his life in the Eastern District of California.  It is also true that MIKSCH has no prior convictions and has resided his entire life in the Northern District.  Those factors ordinarily weigh in favor of release on strict conditions.  Not so for RUSH and MIKSCH, however, given their history and personal characteristics set forth above.  This factor weighs in favor of detention.

**D.    RUSH and MIKSCH Are a Danger to Pre-Trial Services and the Community.**

Finally, the Court considers the extent to which RUSH's and MIKSCH's release would pose a danger to "any person or the community."  18 U.S.C. § 3142(g)(4).[6]

To begin, their release would endanger whichever Pre-Trial Services Officers supervise them and attempt to enforce conditions that they may not recognize as legitimate restrictions on their liberty.[7] Second, RUSH and MIKSCH and the other Grizzlies were preparing for acts of violence.  They were heavily armed and trained together.  They practiced so that they would be more effective at violence.  This fact cannot be understated.  If either man is released, he will be free to re-engage with others and resume those preparations.  The Court might try to limit his contact with other Grizzlies, but those limits may be evaded by motivated users of technology (and the Grizzlies' prior communications indicate that they are), and it would not be possible to prevent him from engaging with other extremists.  In addition, the crimes in this case involve the obstruction of justice by destroying evidence.  If allowed out of custody, they will be free to destroy any remaining evidence that they possess or have the ability to access.

RUSH may also argue that he served his country in the armed forces and that this too weighs in favor of his release.  It does not.  Contrary to RUSH's oath to "support and defend the Constitution of the United States against all enemies, foreign and domestic," he organized and led a group whose purpose was to engage in violent acts against the very government he promised to defend.  Indeed, as he told his fellow Grizzlies, "the gov spent 100s of thousands of dollars on training me, im gonna use that

---

[6] After a detention hearing is set, findings regarding a defendant's danger to the community are appropriate—regardless of the charges in a case.  *See, e.g.*, *United States. v. Megahed*, 519 F. Supp. 2d 1236, 1246 (M.D. Fla. 2007) (rejecting "the premise that detention is not available because of the prospective detainee's dangerousness unless the detainee is charged with a felony listed in Section 3142(f)(1)," and after a "systematic review of the statute" finding that this "interpretation stands athwart both the words of the statute and the sense of the statute").  Section 3142(f), including (f)(1) and (2), establishes procedural pathways to set a detention hearing upon the government's motion.  By contrast, Section 3142(e) substantively identifies the circumstances that then warrant detention: if no condition or combination of conditions assures both (1) the defendant's further appearance, and (2) the safety of the community.

[7] The defendants may counter that they offered little to no resistance on August 6, 2020, when agents executed search warrants at their residences, or on April 8, 2021, when they were arrested.  But these are not fair comparisons.  On both occasions, because of the danger the defendants represented to law enforcement, agents relied on surprise and numbers to mitigate the danger to themselves and others.  Pre-Trial Services will not have the ability to do that.

GOV'T MOT. TO DETAIN                      9
CR 21-121 JD

shit". RUSH's military training makes him more dangerous, not less, and his willingness to turn from his solemn oath to the country that trained him indicates that the Court should not trust him to follow any promise he makes to obey the terms of his release. Thus, this factor also weighs against release.

### E. The Conditions Pre-Trial Proposes Are Not a Sufficient Safeguard.

Pre-Trial's recommendations do not account for the RUSH's and MIKSCH's history and characteristics that underscore the present offenses, including the facts that show they were preparing for violent confrontation with law enforcement and that they do not recognize the government's – and thus, the Court's – authority to impose limits on what they view as their liberties.[8]

With respect to RUSH, Pre-Trial Services recommends that he be released to stay at his residence in Turlock on a $50,000 bond co-signed by his wife, with additional special conditions. Dkt. 16. Those conditions are not sufficient to reasonably assure the community's safety or assure his compliance with supervision upon release. RUSH was living at home, with his wife, while he created, organized, and led the Grizzlies. And this residence is where agents found all of his weapons and tactical equipment.

The same is true for MIKSCH. Pre-Trial Services similarly recommends that MIKSCH be released to stay with his parents on a $25,000 bond co-signed by his father, with additional special conditions. Dkt. 15. But agents seized an arsenal from this very home, and he was living with his parents while he was preparing for civil war and conducting firearms training for other extremists. Again, such conditions are not sufficient to reasonably assure the community's safety or assure his compliance with supervision upon release.

Accordingly, the conditions Pre-Trial Services has proposed do not mitigate the risks of danger that the defendants pose.

### IV. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court order the detention of RUSH and MIKSCH.

---

[8] BLANCAS remains in custody on child pornography charges. A magistrate judge in the Eastern District of California ordered YBARRA's release. The government has moved to revoke that release order. The government's motion is pending.

GOV'T MOT. TO DETAIN          10
CR 21-121 JD

| | |
|---|---|
| 1  DATED: April 13, 2021 | Respectfully submitted, |
| 2 | |
| 3 | STEPHANIE M. HINDS<br>Acting United States Attorney |
| 4 | |
| 5 | _____/s/_____<br>ERIC CHENG |
| 6 | FRANK J. RIEBLI<br>Assistant United States Attorneys |