STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

ERIC CHENG (CABN 274118)
FRANK J. RIEBLI (CABN 221152)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Eric.Cheng@usdoj.gov
    Frank.Riebli@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 21-cr-0121 JD |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | Sentencing Date: January 10, 2022 |
| JESSIE ALEXANDER RUSH, | Time: 10:30 a.m. |
| Defendant. | Judge: Hon. James Donato |

## I. INTRODUCTION

Last year, in a betrayal of the oath he swore to his country, defendant Jessie RUSH formed an armed militia group that discussed—and prepared for—hostilities against the government and confrontations with law enforcement. He appointed himself the commanding officer of the "Grizzly Scouts" and cultivated a forum for members to encourage one another and stoke the aggressions of the group toward violence. As their discussions escalated, one member of the group went on to allegedly target and shoot multiple law enforcement officers in the Bay Area, killing two of them.

RUSH's immediate reaction when faced with the reality of that man's horrific actions, given the nature of the group's prior discussions and preparations, was to obstruct justice—he instructed the man to destroy evidence and conspired with other members of the group to do the same. And rather than disband the group from further activities or come forward to authorities about the man, RUSH and his codefendants did the opposite: they destroyed records and communications of the group and moved their discussions to an alternative communications platform, encouraging other members to reconnect with them there. Only after federal agents executed search warrants at their residences two months later, seizing numerous firearms including assault-style weapons, stockpiles of ammunition, and tactical equipment, did the group's activities finally appear to cease.

Accordingly, RUSH and his codefendants must be held accountable for their crimes with a meaningful custodial sentence. The United States respectfully recommends that the Court sentence RUSH to 12 months of custody (the middle of the applicable sentencing guidelines of 8 to 14 months in this case), followed by three years of supervised release. Given the nature and circumstances of the offense, the seriousness of the offense, and the need for deterrence, the government submits that this sentence would be sufficient but not greater than necessary, based on a consideration of the guidelines and the factors under 18 U.S.C. § 3553(a).

## II. BACKGROUND

In April 2020, Jessie RUSH organized an armed, anti-government militia group called the "Grizzly Scouts" ("Grizzlies") as the group's commanding officer. *See* Presentence Investigation Report ("PSR") ¶ 19; Dkt. No. 83 ("Plea Agmt.") at ¶ 2. He gave himself the rank of Major. *Id.* RUSH recruited several of the Grizzlies' members, including codefendants Robert BLANCAS, Simon Sage

YBARRA, and Kenny MIKSCH, through a Facebook group he created. PSR ¶¶ 19–20. On the Facebook group's front page, he stated the group's association with so-called "boogaloo" extremists:[1] "they say the west won't boog, were [sic] here to gather like minded Californians who can network and establish local goon squads". *Id.* RUSH made MIKSCH and BLANCAS lieutenants, and YBARRA a corporal. *Id.* Another man was given the rank of staff sergeant. *Id.*

The Grizzlies discussed, trained, and prepared for violent confrontations with the government and attacks on law enforcement. PSR ¶ 22; Plea Agmt. at ¶ 2. In May 2020, for example, the Grizzlies prepared for operations, including at a protest in Sacramento. In advance, they distributed "Operations Orders" that identified law enforcement as "enemy forces" and considered the possibility of using lethal force. *Id.* ("Contact with hostile forces … If there is a PERCEIVED or what could be articulated as an IMMEDIATE threat, engage the enemy swiftly and with extreme lethality."). The orders also discussed taking prisoners, *id.*, stating "POWs will be searched for intel and gear, interrogated, stripped naked, blindfolded, driven away and released into the wilderness blindfolded with hands bound. We will not execute POWs; however, we will not render medical aid to enemy WIA [wounded in action]. Enemy WIA will be given some water, searched for intel, interrogated, depending on nature of injury driven to the wilderness or left to their god." In other words, the best outcome for a police officer captured by the Grizzlies would be getting stripped naked and dumped in the wilderness, blindfolded and bound, quite possibly to die. The order also established a so-called "QRF," or a Quick Reaction Force sub-unit that included RUSH, MIKSCH, and the staff sergeant, in the event that whoever they sent into the protest ran into trouble. QRF members were required to carry a rifle and pistol and extra magazines and their job was to rescue the recon element.

Toward the end of May and beginning June, the Grizzlies' discussions of attacks on law

---

[1] As explained in the indictment and PSR, the "boogaloo" is not a single cohesive group, but rather a loose concept which has become a rallying point for some extremists. The term is sometimes used by militia extremists and racially or ethnically motivated violent extremists (RMVE), who allude to it using shorthand such as "big igloo" or "big luau" and imagery such as igloos or Hawaiian shirts. The term has particularly resonated with militia extremists, who have adopted it to reference an impending politically-motivated civil war or uprising against the government following perceived incursions on Constitutional rights—including the Second Amendment—or other perceived government overreach. Some RMVEs have used the term to reference an impending race war—or other conflict that will lead to the collapse of the "system," including the U.S. government and society. PSR ¶ 16.

enforcement matured.  Between May 26 and 27, 2020, YBARRA and the staff sergeant began to discuss plans.  YBARRA wrote, "I feel it.  I partially just want a concrete plan".  "I feel like that one had some holes", he said.  The man YBARRA was communicating with said his vision was "cartel style."  YBARRA responded, "Bro we have to talk about this in person".  "There needs to be a protocol in place, and it needs to be done a certain way.  We can talk about this and reach an understanding about how this needs to work."  They met behind a gas station in Los Gatos, near YBARRA's home, and sat in the man's van and assembled an assault rifle.  The day after that, May 28, 2020, the man contacted YBARRA about attending a protest in Oakland the next day, on May 29, 2020, to "snipe some you know what's [sic]."  YBARRA does not appear to have responded, but the man is alleged to have ambushed two federal protective service officers in Oakland that night, killing one and wounding another.  That murder and attempted murder are charged in a separate federal case arising out of that incident.  PSR ¶¶ 8–9, 17–18.

At the same time YBARRA was discussing plans to attack law enforcement with that staff sergeant, he was also reporting those conversations to RUSH.  On May 26–27, 2020, he told RUSH that he had spoken with the man and that he "just wanted to make sure we are on the same page, and that targeting innocents doesn't fly with me even if they are wearing a badge."  RUSH agreed, but added, "yea we need to actually develop targets and cases, be smart. They want war, then we bring em war."  PSR ¶ 23.  In other words, it wasn't the idea of killing people that RUSH or YBARRA opposed, they just didn't want to kill purportedly low-value targets.  RUSH confirmed this a moment later:  "we can start developing case files, gathering intel, and doing it just like big bro does" "im not about the fireworks" "im more like a surgeon".  *Id.*  RUSH also said "the gov spent 100s of thousands of dollars on training me, im gonna use that shit", meaning that he was going to put his military training to use in planning their attacks.  *Id.*

Beginning June 1, 2020—just three days after the shootings in Oakland—the Grizzlies ratcheted up their rhetoric and preparation for attacks on law enforcement.  The staff sergeant sent the group a link to an article about the President considering whether to invoke the insurrection act in response to the nationwide protests in the wake of George Floyd's death.  "[T]hat ^^^ will be our sign," RUSH told them.  "That effectively means the federal gov has declared war in things they're afraid of. Anything

like this or a move that resonates with this is our trigger point.  If y'all aint giving with that bail now", he said.  PSR ¶ 24.  In other words, RUSH was preparing the group for war against the government if the Insurrection Act, 10 U.S.C. § 252, was invoked.  And in response to the staff sergeant's further statement about "easy pickins first to demoralize" regarding law enforcement, RUSH told the group, "Get right with your gods, families and selves."  "If you weren't ready, I sure as hell hope you fake the funk good," he added.  *Id.*  "This is unfortunately one instance where fake it till you make it doesn't cut it," MIKSCH responded.  *Id.*  "Fake it till you dirt nap", BLANCAS added.  "I think it's time to swap your plates bud" RUSH told MIKSCH, meaning, it was time for MIKSCH to put heavier-duty protective plates in his bullet-proof vest.  And after the staff sergeant inquired to the group regarding the Oakland Police Department, "Well shall we go out tonight and thin their herd? … I was under the impression the guard would be there but if theyre not there yet then we still have a chance", RUSH responded, "even when they show up you still have a chance".  PSR ¶ 24.

By June 2 and 3, 2020, the Grizzlies began to discuss whether it would be better to provide aid to "Antifa" groups to encourage them to attack law enforcement first, then open their own campaign of violence against a (presumably) weakened police force.  In referencing this, BLANCAS called it "the tactically sound option".  PSR ¶ 25.  YBARRA said he thought aligning with those groups "would be short-sighted."  "I don't want to get taken out of the fight before shit kicks off just because I engaged in a psy-op", he said.  But the staff sergeant went on to say "Tactically, we should be yeeting solo cops and taking their shit" and BLANCAS insisted that "Them fucking each other up only helps us".  PSR ¶ 25.  In response, YBARRA gave a thumbs-up emoji.  *Id.*  Step One, as BLANCAS saw it, was "Antifa" and police engaging in armed confrontation.  "[S]tep two, cops win.  Third step is we start yeeting cops when they're done.  I'm also totally down with disguising ourselves as antifa and [yeeting] some cops that way", he said, meaning that he was willing to pose as member of "Antifa" and kill police officers as a way to kick off an all-out confrontation between the police and those groups.  *Id.*

Throughout these conversations, the staff sergeant advocated openly for attacking the police immediately.  *Id.*; PSR ¶ 19.  None of the other Grizzlies, including the defendants here, disagreed with him; to them, it was a question of "When" or "How," not "If."  Three days later, on June 6, 2020 in Santa Cruz County, that same man is alleged to have gotten into a shootout with sheriff's deputies,

killing one and wounding another. PSR ¶¶ 10–15. In the moments leading up to those shootings (which are the basis for pending state murder and attempted murder charges), the man communicated with the rest of the Grizzlies, asking them to come to his aid. PSR ¶ 26. MIKSCH—who later admitted that he and the group generally listened to police scanners—notified the group that "they," meaning the sheriff's deputies, "have a dog," meaning a police K9 (which the deputies in fact had), but that he didn't think it was a planned raid because "[t]rue raids are usually done at like 3-4" in the morning. RUSH agreed. But the staff sergeant believed the deputies were there for him. "Dudes I offed a fed" he told the other Grizzlies. PSR ¶ 26. RUSH's first response was to tell the man to erase the evidence on his phone and "exfil," meaning, evade capture. PSR ¶ 27.

      Sheriff's deputies captured the man later that day, but the defendants moved quickly to destroy evidence to obstruct official proceedings. PSR ¶¶ 13, 28–29; Plea Agmt. at ¶ 2. They conspired together to erase the group communications in which they discussed and planned to attack police from their phones, including the statements described above, and BLANCAS destroyed files related to the Grizzlies' operations. *Id*. As BLANCAS told YBARRA a month later, "We burned tf [the fuck] out of everything" "All physical files I had were literally burned". But contrary to what they would all later tell FBI agents, the Grizzlies didn't disband. They just switched to a different communications platform, one they thought would be more secure. PSR ¶ 29; Plea Agmt. at ¶ 2.

      Nor did they appear chastened by the fact that one of their members could be involved with these officer shootings. Instead, in messages the day after the second shootout, it was clear that they were mad at him for making it more difficult for them to operate as a group, but not for allegedly killing police officers. RUSH got over his heartache quickly though—within a couple weeks, he began contacting other Grizzlies and recruiting them to join him on the new communications platform. "Jump on [another communication's platform] if you miss us were [sic] reinventing and if you wanna be apart [sic] of it we'd love to have you back" he told one member. PSR ¶ 29.

      On August 6, 2020, two months after the shooting in Santa Cruz county, FBI agents executed search warrants at several locations, including RUSH's, BLANCAS's, YBARRA's, and MIKSCH's residences and vehicles. PSR ¶ 31. They seized numerous assembled and disassembled weapons, including the following from RUSH in Turlock: three pistols (one of which had an extended magazine),

a disassembled assault-style rifle, numerous high-capacity magazines and ammunition for the pistols and assault rifle, a plate carrier with armor plates (i.e., a bullet-proof vest), a helmet, a knife and a radio. Agents also seized their cell phones.  Plea Agmt. at ¶ 13.  Subsequent examinations of certain of those phones showed that they were the same devices used by the men on June 6, 2020, when the Grizzlies were communicating with their member who allegedly engaged in a shootout with sheriff's deputies— but those communications had been erased from their phones.  Plea Agmt. at ¶ 2.

The grand jury indicted RUSH, BLANCAS, YBARRA, and MIKSCH on the present charges on March 23, 2021.  Dkt. No. 1.  On April 8, 2021, agents arrested RUSH.  He made his initial appearance the next day and a detention hearing was set for April 14, 2021 upon the government's motion for detention.  Dkt. Nos. 5, 17.  Following a detention hearing, RUSH was released on bond.  Dkt. No. 18.

On September 13, 2021, RUSH pleaded guilty to Count One of the Indictment pursuant to a plea agreement under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.  Dkt. No. 77.  In the plea agreement, the parties agreed that a reasonable and appropriate sentence was 6 to 12 months of imprisonment followed by 3 years of supervision, with the government's promises with respect to RUSH and his codefendants contingent on the other codefendants also pleading guilty, the Court accepting those plea agreements, and RUSH and his codefendants appearing for sentencing and surrendering to serve any sentence imposed by the Court.  Dkt. No. 77.

### III.     DISCUSSION

####   A.     Applicable Law

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines. *Id.*  After determining the appropriate Guidelines calculations, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991–93.  Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3)  the need for the sentence imposed to afford adequate deterrence to criminal conduct; and

(4)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### B.  Guidelines Calculation

The United States Probation Office ("Probation") accurately calculates the United States Sentencing Guidelines in the PSR, and it is consistent with the parties' plea agreement. PSR ¶¶ 38–48; Dkt. No. 83 ¶ 7.

The PSR correctly calculates the total offense level as 11. PSR ¶ 48. The base offense level is 14 under U.S.S.G. § 2J1.2(a), and a two-level enhancement applies because the offense involved the destruction of essential records; in this case, records related to the murder of a federal PSO just days prior under § 2J1.2(b)(3)(B). PSR ¶¶ 38–39. The government agrees with the three-level reduction for acceptance of responsibility under § 3E1.1 and a two-level reduction for a global disposition among the codefendants under § 5K2.0(a)(2)(B). PSR ¶¶ 45–47. The PSR also correctly calculates the defendant's criminal history as category I, as the defendant has no prior criminal history. PSR ¶ 52.

Because the total offense level is 11 and the defendant's criminal history category is I, the sentencing range under the Guidelines is 8 to 14 months of imprisonment. PSR ¶ 100.

### C.  Recommendation

The government recommends that the Court impose a sentence of 12 months of custody followed by three years of supervised release, based upon a consideration of the Guidelines and 18 U.S.C. § 3553(a) factors. The government's recommendation takes into account RUSH's history and characteristics, including his lack of prior criminal history and difficult upbringing. The recommended sentence of imprisonment is in the middle of the agreed-upon Guidelines, which already includes downward adjustments for acceptance of responsibility and the global disposition of the codefendants from an extremist group. Indeed, Probation acknowledges that a custodial sentence is appropriate for RUSH in view of the 3553 factors and a thorough evaluation of RUSH's history, recommending a

custodial sentence in the PSR as well.  PSR Rec. at 1.  The government's recommendation of a 12-month term of custody would be sufficient but not greater than necessary based on the nature and circumstances of the offense, the seriousness of the offense, and the need for deterrence.

*First*, the nature and circumstances of RUSH's offenses support a meaningful custodial sentence.  RUSH formed the armed "Grizzly Scouts" extremist group, fostered its recruitment of members, and encouraged aggression against authorities to fester among its members.  He had key roles in "operations orders" that identified law enforcement as enemies and stoked anger in discussions about violence against them.  As a former member of the military, RUSH brought significant experience, training, and authority to the group as its members escalated toward violence against law enforcement—knowing this well, he even said "the gov spent 100s of thousands of dollars on training me, im gonna use that shit", when talking about developing "targets" and "cases" and "bring[ing] war."  And it was RUSH, the commanding officer of the group, who immediately instructed the member who stated he "offed a fed" to wipe evidence from his phone.

*Second*, the government's recommended custodial sentence accounts for the seriousness of RUSH's crimes.  In light of RUSH's participation in the Grizzlies' abhorrent discussions about committing violence against law enforcement and armed uprising against authorities, as well as the group's training and preparations together, RUSH conspired with his codefendants to destroy records relevant to the murder of a federal officer and destroyed those records to obstruct any subsequent investigation or prosecution.  The government's recommendation of 12 months of custody promotes respect for the law and provides just punishment for RUSH in view of this wrongful conduct.

*Third*, in addition to providing specific deterrence to RUSH, the Court's sentence should provide general deterrence to others against conspiring to commit such obstruction in the midst of extremist aggression and potential violence.  Accordingly, this case merits a 12-month custodial sentence in view of the need to achieve general deterrence for those who may face similar circumstances and be tempted to obstruct justice in violation of the law.  The parties also agree on a three-year term of supervised release, including an expanded search condition.  Given the nature of RUSH's extremist and obstructive conduct, such a term of supervised release with this condition and the conditions recommended by Probation is necessary to serve the interests of deterrence and rehabilitation.

## IV. CONCLUSION

For the foregoing reasons, the United States respectfully recommends that the Court impose a sentence of 12 months in custody, followed by three years of supervised release with the expanded search condition agreed to by the parties and other conditions recommended by Probation.

DATED: December 27, 2021                            Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

           /s/
ERIC CHENG
FRANK RIEBLI
Assistant United States Attorneys