Law Office of Adam Pennella
Adam Pennella, State Bar No. 246260
717 Washington Street
Oakland, CA 94607
Phone (510) 451-4600
Fax (510) 451-3002

Counsel for Defendant
JESSIE RUSH

UNITED STATES DISTRICT COURT
NOTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: CR 21-0121 JD |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR VARIANCE** |
| vs. | |
| JESSIE RUSH, | Date:  January 10, 2022 |
| Defendant | Time: 10:30 a.m. |
| | Honorable James Donato |

Defendant Jessie Rush respectfully submits the following sentencing memorandum and motion for variance.

## **INTRODUCTION**

Mr. Rush is a severely damaged individual who made a serious mistake in the context of an unusual culmination of factors – the pandemic, social unrest, loss of his job, extreme (political and other) polarization in the country, and targeted (mis)information on social media platforms – that exacerbated his worst fears, paranoia, and vulnerabilities.  Those fears and paranoia were largely borne from a life filled with psychological, emotional, and physical injury, much of which was sustained serving his country in combat. This led to him feeling the need to surround himself with a community and prepare for the worst "if" certain events came to unfold.

During this period of time, he expressed very concerning statements about violence against law enforcement with his fellow Grizzly Scouts and, after learning that Steven Carrillo killed a protective services officer, reacted by attempting to delete evidence and any connection between himself and his fellow Grizzly Scouts' connection to Mr. Carrillo. He knows what he did was wrong, is full of shame, and punishes himself daily. (See Ex. A, Statement of Jessie Rush). He has accepted responsibility for his actions and will accept any punishment imposed by the Court.

As can be seen from Mr. Rush's history, this is aberrational conduct. He is not someone who has led a life of crime, preyed on others, or acted selfishly. To the contrary, his history shows an intention to work for and serve others: putting himself in harm's way to protect his younger brother; participating in the Sea Cadet and Police Explorer programs in high school; enlisting in the military at age 17, including two tours of heavy combat in Afghanistan during which he suffered serious psychological and physical injuries; after war, trying to save a young child; working as a firefighter and EMT; and then immediately preceding the offense conduct, working in private security researching and assessing threats to those he was hired to protect.

While this work was honorable, for a young man whose life was replete with serious psychological and physical abuse, lack of stability, and a broken home, this was all a recipe for disaster. As Mr. Rush explains, he has a history of "compounding" his problems: instead of dealing with and processing past trauma, he has moved from one traumatic experience to the next. But he has shown that since the search of his house in August, 2020, he has made significant strides in addressing his issues: he communicated with the agents in this case, sending them information he learned of through work that he thought they might find useful prior to the January 6 coup attempt; when agents asked to meet with him (a ruse to arrest him),

1   he drove to a local police station where he was arrested without issue; during pretrial release, he

2   found employment, actively engaged in therapy, and been of perfect compliance. Since his

3   arrest, he has shown a real willingness, desire, and ability to address his past. This has included

4   removing the toxicity from his life and focusing on healthy living and stress management;

5   engaging with family members and pro-social behaviors; working at a job that he has found

6   rewarding that allows him to give back in a way that does not add or compound more trauma.

7       As a result, one of the leading experts in evaluating and treating complex PTSD in

8   combat veterans opines that Mr. Rush is an excellent candidate for successful treatment

9   (discussed below).

10                                            ***

11      This Court is tasked with crafting a sentence that is sufficient, but not greater than

12  necessary, to effectuate the sentencing purposes set forth in 18 U.S.C. § 3553. In this case, with

13  this defendant and his history, that is a difficult task. Mr. Rush understands and accepts that he

14  needs to be punished. And the tragedy that stems from Mr. Carrillo's actions cannot be

15  minimized. However, he requests that this Court sentence him for his criminal conduct and

16  adequately take into account how his mental illness affected his decision making during a

17  stressful period of time, and how this affects his culpability.

18      He also requests that this Court not add another element of trauma – custody – which he

19  will survive but will undoubtedly damage him further. He therefore requests a sentence that

20  allows him to keep his current job, address his myriad (primarily psychological) issues, and give

21  back to others by discussing his experience. Specifically, he requests a sentence that includes no

22  further custody time, and instead substitutes a 90 day term of imprisonment with a 90 day

23  inpatient PTSD program, followed by a period of home confinement or location monitoring that

24

1    restricts his liberty but enables him to keep his job, 100 hours of community service, part of

2    which could be satisfied by him engaging with or speaking to others similarly situated (i.e.

3    combat veterans with PTSD) by sharing his experience and helping others avoid the same

4    pitfalls.[1]

5          In addition to the personal and public shame he has suffered, such a sentence would

6    adequately punish Mr. Rush but would not derail the progress he has made. It is justified

7    considering his history of severe physical and psychological trauma suffered as a child, as well

8    as that sustained while honorably serving his country and community. This is particularly

9    apposite given that his service and history had the effect of contributing to the offense conduct

10   by making him paranoid and hypervigilant. Moreover, his history of employment and post-

11   offense rehabilitative efforts make him likely to perform well on supervision and avoid contact

12   with the criminal justice system again. Finally, the recommended sentence would be consistent

13   with those imposed for this same crime across the country and would therefore avoid sentencing

14   disparity.

15                        **MENTAL HEALTH EVALUATION AND CONSIDERATIONS**

16         To try to gain some understanding as to how Mr. Rush ended up committing this crime –

17   and the psychological factors associated with this particular offense conduct – counsel engaged

18   Dr. Rahm Minagawa, Ph.D, a licensed clinical and forensic psychologist with a twenty-plus year

19   history of working for the military and with veterans, and one of the leading experts in PTSD.[2]

20   (See attached, Ex. B, Confidential Psychological Report, filed under seal, and Ex. C, Dr.

21   Minagawa's resume).

22

23   _____
     [1] In a case involving undersigned counsel, this Court has previously included, *sua sponte*, a similar requirement as a
     term of probation.

24   [2] Dr. Minagawa can be available to testify if the Court requests to hear from him directly.

1   Dr. Minagawa administered six psychological tests and interviewed Mr. Rush at length.

2   He also reviewed numerous documents and medical records. Dr. Minagawa found that Mr. Rush

3   suffers from chronic PTSD and major depressive order with anxious distress. These diagnoses

4   were consistent with those made by prior mental health providers in the military. In his report,

5   he explains how Mr. Rush's psychological damage (particularly severe and complex PTSD)

6   from childhood trauma, heavy combat, and work in the security field affected his deliberate,

7   balanced decision making, and contributed to his commission of the crime.

8   The extensive testing, which confirms the above diagnoses and opinions, reveals

9   significant elevations in anxiety, depression, and other factors confirming that Mr. Rush

10  continues to suffer from severe PTSD. They also show a level of consistency indicative of

11  accuracy and honesty in responding to the numerous questions. Of particular relevance to this

12  case and the Court's ultimate decision on sentencing, Mr. Rush does not have a propensity for

13  violence, self-harm, or suicide. He does not present "any type of risk for imminent or future

14  violence." Other noteworthy findings are as follows: Mr. Rush can be immature and impulsive;

15  he is experiencing an intense conflict between a desire to withdraw from relationships and a

16  strong fear of acting autonomously; he is aware that he depends on others but resents feeling

17  needy; there is a lack of concern of alcohol abuse.

18  Dr. Minagawa explains that childhood trauma – such as that experienced by the young

19  Jessie Rush – has the effect of physically altering the brain. As a result of that trauma alone, Mr.

20  Rush was "already at great risk" to develop psychological problems: "because childhood abuse

21  occurs during the critical formative time when the brain in being physically sculped by

22  experience, the impact of severe stress can…irreversibly alter neural development."  In essence,

23

24

the brain is altered as a result of processing the abuse, leading to a high likelihood of mental illness.

Consistent with that history, Mr. Rush has a very elevated Adverse Childhood Experience (ACE) score of six. The research shows that individuals with a score of four or greater are twice as likely to be diagnosed with cancer and 460% more likely to suffer from depression. Finally, an ACE score of six or greater is shown to shorten an individual's lifespan by almost twenty years. This means that, as a result of Mr. Rush's troubling childhood trauma alone – without factoring in the effects of his military and other service – he is almost certain to suffer severe physical and psychological consequences, including an assuredly shortened lifespan.

Dr. Minagawa discusses some of the factors that are relevant to Mr. Rush's commission of the crime and why he opines that treatment can be successful. He notes that Mr. Rush accepts full responsibility for his offense and demonstrates appropriate remorse for his conduct. He highlights how Mr. Rush's protective and defensive nature contributed to his offense conduct. This character trait has been a consistent theme in Mr. Rush's life, from seeking to protect his brother from his father's abuse, participating in the Sea Cadets and Police Explorers, enlisting in the military, trying to save a young girl from abuse, and working as a firefighter, EMT, and in private security.  The evaluation also highlights the importance of Mr. Rush's need for a sense of belonging. This desire is best illustrated by Mr. Rush's explanation of what was so important to him about his experience in the military: a "feeling of total acceptance" by his enlisted peers that Mr. Rush describes as the "complete, purest form of trust." Undoubtedly, this feeling was so important to Mr. Rush given the lack of consistency, stability, and acceptance that he experienced throughout his childhood and teen years. Dr. Minagawa explains that Mr. Rush

tried to recreate this feeling with the Grizzly Scouts during a particularly stressful time in his life: he lost his job as a result of the pandemic's effect on the economy; he was inundated with conspiracy theories on social media; he felt as if the country was about to tear itself apart; he was angry at law enforcement's behavior towards protestors; he was still suffering from nightmares, disturbances of sleep and flashbacks; and he was experiencing marital issues.

In Mr. Rush's telling, he explained that he views himself as having two separate personas, "Jessie" and "Rush." "Jessie" is the more mellow persona and "Rush" is the more militaristic and action-oriented persona. Leading up to his participation with the Grizzly Scouts and commission of the offense conduct, he became more paranoid, fearful, and insecure, which is when "Rush" took over to "get a sense of control and direction, and to counter all of the chaos that was going on around him."

Dr. Minagawa concludes that despite the concerning behavior and lack of judgment illustrated by the offense conduct, Mr. Rush is an "excellent candidate for treatment;" in essence, his ability to exercise sound judgment can be restored. Dr. Minagawa notes that Mr. Rush does not present any type of risk for imminent or future violence, nor does he have a history of violent behavior as a child or adult; he completed his military assignments with great distinction, earning numerous commendations; he has evidenced a history of compliance during pretrial supervision and in the military; and perhaps most importantly, there is a significant element of "buy-in" by Mr. Rush to the need for and benefits of therapy. He demonstrates recognition and insight into the issues that have plagued him throughout his life, and led him to committing the offense in this case.

Dr. Minagawa recommends one of the several residential treatment programs geared towards treating veterans – like Mr. Rush – suffering from PTSD. He notes that Mr. Rush

expressed a desire for such a program, as well as continued treatment, and that his work would

enable him to take a leave of absence to obtain such treatment. This latter point is critical, as Mr.

Rush's current job seems to provide a perfect hybrid for a person like him: it allows him to use

his skills to help others while limiting the level of trauma he experiences. It also allows him to

explore other, "non traumatic" ways to work with and help others, while providing him with

stability and an important avenue for growth.

## PROBATION REPORT AND RECOMMENDATION; OBJECTIONS

U.S. Probation Officer Jessica Goldsberry prepared a thorough and thoughtful

Presentence Investigation Report (PSR) in this matter. The Guidelines calculations (adjusted

offense level of 11) are consistent with the terms of the parties' plea agreement and there is no

dispute with the calculation of Mr. Rush's Criminal History Category (I). Mr. Rush has no

objection to those calculations; nor does he have an objection to the content contained in the

report. He only requests a slight modification to the ultimate sentence recommended.

## PERSONAL HISTORY AND CHARACTERISTICS

The PSR thoroughly summarizes Mr. Rush's sad and traumatic upbringing.  The first

five years of his life consisted of being bounced around between his mother, various family

members, and foster care (including what he has described as an orphanage as well as a foster

family). His mother was 17 years old when he was born, and was ill equipped to raise a child.

She also had her own issues, getting into trouble and apparently suffering from substance abuse

issues when he was a young child.

Then at age five, he moved in with his father and stepmother. It was made clear to him

that he was not really part of the family, as he was the product of his father cheating on his

stepmother (while she was pregnant) with Mr. Rush's mother. For the next six years, he suffered

serious physical, emotional, and psychological trauma, discussed in detail in the PSR. The young Jessie Rush and his half-siblings were beaten regularly for even the most minor error, including being punched and kicked, beaten with a belt, and having his earlobes pulled so hard they would partially detach. These attacks would often result in visible injuries.

He also describes having no "bodily autonomy," as his father would regularly monitor how he washed himself in the shower or went to the bathroom, on some occasions bringing his siblings in to watch. Indeed, he explains that it was not until he was in the military that he was able to use a public restroom. He was also forced to undergo rigorous exercises and diets related to sports and his weight, including being on starvation diets, drinking lots of water before dinner so that he felt full, and chugging energy drinks before games. He explains how this led to him having issues with weight and diet since, explaining that he sometimes binge eats and sometimes does not eat at all. He is still working through these problems to this day.

During this period of time, his mother got her life back on track, and Mr. Rush went to live with her and her husband at age eleven. He describes this as a positive period in his life, as his stepfather was good to him and was a positive role model. However, he recounts how scarred he was, once responding to being verbally disciplined by exclaiming, in a fit of tears, "when are you going to hit me?" He also had panic attacks prior to going to visit his father.

He finally disclosed his father's abuse to his mother. But shortly thereafter, when Mr. Rush's stepbrother visited covered in bruises, he recanted the abuse to his mother so that he could spend weekends at his father's house in order to protect his brother. He explains that while she likely did not believe him, she allowed him to return there but gave him a cell phone in case there were issues. Given that his father was afraid of Mr. Rush's stepfather, there was no abuse

of Mr. Rush or his siblings during those visits. However, Mr. Rush never received any treatment to process the trauma. Rather, as is a theme in his life, he simply moved forward.

During high school, Mr. Rush struggled with school and acted out. However, he found some direction in extracurricular activities: he joined the Sea Cadets and Police Explorers programs, which his mother describes as very important to him. (See Ex. D). Nonetheless, he had problems with drinking, using drugs, and getting into fights. His mother had a difficult time dealing with him and, for the last couple years of high school, sent him back to live with his abusive father. This culminated in his father strangling Mr. Rush, who punched him back, and Mr. Rush being prosecuted. At that time, however, Mr. Rush was already seeking to join the Army, and a recruiter helped him resolve the matter. He then graduated from high school early and joined the Army at age 17.

At the end of his military term, he was told that he had a daughter with an ex-girlfriend who had substance abuse issues. When Mr. Rush went to meet his daughter, he saw evidence of abuse and neglect, likely at the hands of the mother's then boyfriend. Despite the fact that Mr. Rush's mother convinced him that she was not his biological daughter – the timing of conception would have happened when he was out of the country – Mr. Rush expressed a need to save her from the abuse, telling her that he "needed to save her." (See Ex. D, letter from Christian Soares). He petitioned for custody and cared for her for the next year or two. Given the serious mental health issues he was dealing with after his service, the biological mother's family told him they could care for the girl, and everyone agreed that would be best.

After his military service (discussed below), he worked various odd jobs as a bouncer or in security. At age 23, he married Julie Rush, a woman 17 years his senior (the same age as Mr. Rush's mother). While he is dedicated to her and their relationship, it has caused a lot of strain.

1   He is unsure if their marriage will survive. He also wonders whether he rushed into such a

2   serious relationship so quickly in order to distract him from his own problems.

3   **Jessie Rush's Military Service and Service to the Community**

4           As detailed in the PSR, Mr. Rush served his country honorably. He enlisted in the Army

5   at age 17. After basic training, he was deployed to Afghanistan and served in combat shortly

6   after turning 19 years old. His unit was charged with providing security to a Navy Seal unit in

7   the Northern Provinces and, as a result, he was involved in very heavy fighting on an almost

8   daily basis for a year. As described in the letter from his sergeant (See Ex. D, letter from Sgt.

9   Charles Fowler), his assignment was the such that he "truly witnessed atrocities of war." He

10  observed carnage and death on a daily basis. This included attempting to save a civilian whose

11  intestines were falling out by holding them in place with his hands. He witnessed the remains of

12  a child blown up by an IED, a civilian whose legs were blown off after stepping on a landmine.

13  He saw a teenager killed by the Taliban because he wouldn't work with then. On one occasion,

14  his unit was bringing books and other supplies to a local school; the Taliban threw a grenade

15  into the school and he recalls seeing the remains of the various children who were killed. He was

16  in Afghanistan at the time Osama bin Laden was killed; he recalls that in the weeks thereafter,

17  IEDs were everywhere. He still has "survivor's guilt" from seeing the remains of a family blown

18  up by an IED that was meant for his platoon. Others in his unit were injured and killed,

19  including one of his closest friends from basic training. Then in the years after discharge,

20  multiple of his friends from the military died (one from an overdose, another from a brain

21  aneurism, and a third from suicide).

22          Mr. Rush also sustained physical injury himself when a rocket propelled grenade hit his

23  armored vehicle. His vehicle toppled over and he was thrown into radio equipment and the

24

vehicle's bulletproof windows. That incident resulted in traumatic brain injury (TBI) and injuries to his shoulder that required surgery. Indeed, had he reported that physical injury at the time, he would have been medically discharged and received the Purple Heart. He did not report the severity of the injury until later so that he could return to fight with his unit after a two-week stint of rest and recuperation ("R&R"). He did not feel right leaving his unit behind.

After two tours in Afghanistan, he returned to Germany and then to Ft. Sill in Oklahoma. While there, he experienced serious flashbacks, nightmares, and self-medicated with alcohol. He also attempted suicide: a friend found him passed out in the bathroom with an empty bottle of vodka and an empty pill bottle. He was taken to the hospital and his stomach was pumped. It got serious enough that his sergeant helped him enroll in an inpatient program. He was eventually medically discharged from the military, deemed 80% disabled, primarily due to PTSD. He was bestowed numerous awards and commendations.

After discharge in 2014, Mr. Rush did not receive mental health treatment until he was released from custody on pretrial release in April, 2020. He explains that while he sought out mental health treatment through the VA, obtaining appointments and treatment was difficult. He simply moved on, avoiding the hard work of processing his trauma, and moving onto the next job.

After a few stints working as a bouncer and security guard, Mr. Rush worked as an EMT and a firefighter. The latter job was his career goal; however, he would not get completely hired on as a full-time firefighter and as a result, needed to move on. Given his EMT training, he worked as an EMT, another rewarding job helping others. However, it also caused him to witness the results of accidents and other traumatic circumstances.

That eventually became too much for him, so he returned to security, ultimately landing jobs in executive security. While he was well-prepared and trained for such work due to his military and combat history, it also caused him to live life through a lens of threat assessment. An otherwise good job he was well-suited for that paid well had the effect of exacerbating his paranoia and vigilance.

Mr. Rush currently works as an on-site medical representative at a large warehouse. He deals with immediate triage and provides basic medical care. He finds the job a healthy balance of rewarding in that he can help others, but without having to regularly respond to more severe events that were common as a firefighter and EMT. At work, he also has avenues to assist others: he can apply for donations from his employer to those in need, and recently obtained a $40,000 donation to a rural, impoverished school district; he is the head of the veteran's committee and is setting up a "Warrior Week" there, as well as working to hire more veterans. His job currently provides him a healthy and structured outlet to be productive, contributing, and help others while avoiding some of the risks that were prevalent in his prior employment. He also has the ability to take a medical leave of absence from work to attend an inpatient PTSD program, and be able to return to his job thereafter. Between his VA benefits and medical insurance, there are programs for which he can qualify.

## SENTENCING CONSIDERATIONS

In determining a reasonable and appropriate sentence, the Court must consider those factors set forth in 18 U.S.C. 3553(a), including the nature and circumstances of the offense and the history and characteristics of the defendant.  The Guidelines are advisory, *Gall v. United States*, 552 U.S. 38, 46-47 (2007), and there is no presumption in favor of a Guidelines' calculation. *Nelson v. United States*, 555 U.S. 350, 352 (2009) (citation omitted) ("Our cases do

not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable. In *Rita* we said as much, in fairly explicit terms: "'[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.'").   The District Court is thus not required to use a formulaic approach to produce a mathematical justification for a non-Guidelines sentence. *Gall*, 128 S.Ct at 596.  Rather, it must exercise a "reasoned sentencing judgment, resting upon an effort to filter the Guidelines' general advice through § 3553(a)'s list of factors. *Rita v. United States*, 127 S. Ct. 2456, 2469 (2007).  In short, the District Court's duty is to impose the least amount of time necessary to achieve 3553(a)'s purposes.  The Guidelines are subordinate to that duty.

When this Court applies the section 3553(a) factors to Mr. Rush, the following circumstances, which are not considered by the Guidelines, warrant a variance: (1) Mr. Rush's serious ongoing mental health issues, which directly contributed to his offense conduct and will only be exacerbated by imprisonment; (2) Mr. Rush's cumulative life exposure to serious trauma, including physical, psychological, and emotional abuse; (3) Mr. Rush's exceptional history of service to his country and community; (4) Mr. Rush's perfect compliance on pretrial release, including his employment history and importance of maintaining his current job; and (5) the need to avoid sentencing disparity between Mr. Rush and others who have been sentenced around the country for similar violations.

### A. Mr. Rush's mental health issues, including continuing severe PTSD, justify a downward variance

The 2010 amendments to the Sentencing Guidelines "demonstrate that, where mental illness . . . [is] a contributing factor greatly or even only limitedly in a crime, such defendants are more likely less-deserving of punishment . . . .  [I]n fashioning an appropriate sentence, courts are now required to consider, and factor in, a defendant's mental illness if they are to be faithful

1    to § 3553(a)." *Ferguson*, 942 F. Supp. 2d at 1194 (M.D. Ala. 2013). In *Ferguson*, the district

2    court explained in detail how the federal courts should consider a defendant's diminished

3    capacity to accurately evaluate his culpability for criminal conduct:

> The Commission's policy statement on mental and emotional conditions compliments USSG § 5K2.13, which identifies diminished capacity as a basis for downward departure on the ground that it may not have been taken into consideration otherwise in calculating the guidelines range. USSG § 5K2.0(a)(2)(A). This provision authorizes diminished-capacity departures where "the defendant committed the offense while suffering from a significantly reduced mental capacity; and the significantly reduced mental capacity contributed substantially to the commission of the offense." USSG § 5K2.13. It "comprehends both organic dysfunction and behavioral disturbances" so long as those conditions "impair the formation of reasoned judgments." *United States v. Cantu,* 12 F.3d 1506, 1513 (9th Cir.1993) (finding PTSD, mood disorders, and schizophrenia qualify the defendant for a diminished-capacity departure to the extent they frustrate his ability to make reasoned decisions).
>
> Together, the amendments and policy statements reflect the principle that "punishment should be directly related to the personal culpability of the criminal defendant." *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), *abrogated on other grounds, Atkins v. Virginia,* 536 U.S. 304, 307, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). A few "exceptionally" mentally ill defendants may be found incompetent to stand trial or judged not guilty by reason of insanity; however, there also exists a spectrum of mental deficits and diseases that lessen, but do not erase, a person's responsibility for her crimes. *See* Jennifer S. Bard, *Re–Arranging Deck Chairs on the Titanic: Why the Incarceration of Individuals with Serious Mental Illness Violates Public Health, Ethical, and Constitutional Principles and Therefore Cannot Be Made Right by Piecemeal Changes to the Insanity Defense,* 5 Hous. J. Health L. & Pol'y 1, 4–5 (2005). "[E]vidence about [a] defendant's background and character is relevant" to the sentencing decision, "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry,* 492 U.S. at 319, 109 S.Ct. 2934 (quoting *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring)). In addition, the traditional rationales for punishment have less force when applied to mentally ill and cognitively limited defendants. *Cantu,* 12 F.3d at 1516; *United States v. Poff,* 926 F.2d 588, 595 (7th Cir.1991) (en banc) (Easterbook, J., dissenting), *cert. denied,* 502 U.S. 827, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991). "Desert (blameworthiness) loses some bite because those with reduced ability to reason, or to control their impulses, are less deserving of punishment than those who act of viciousness or greed," *Cantu,* 12 F.3d at 1516; "Deterrence has less value ... because people with reduced capacities are less susceptible to a system of punishment and reward." *Id.*

*Id.* at 1192–93.  In *Ferguson*, the district court found that the defendant's "untreated [PTSD] and borderline-impaired IQ were related to [her] involvement in" the charged offense and therefore justified a below-Guidelines sentence.  *Id.* at 1194.  In sum, "where mental illness or cognitive deficits are a contributing factor greatly or even only limitedly in a crime, such defendants are more likely less-deserving of punishment for punishment's sake than are those without such limitations."  *Id*.

Similarly, Jessie Rush's mental health issues made him prone to feelings of isolation, paranoia, and hypervigilance, all of which contributed to the offense conduct. He tried to replicate the sense of belonging, and therefore safety, that he had in the military with the Grizzly Scouts during a distressful period in his life. While these factors do not negate his guilt, they are all important considerations that militate for a variance.

And despite that fact that he has received some treatment – both while in the military and on pretrial release over the past several months – the testing confirms that even today, Mr. Rush continues to suffer from severe PTSD and depression. Dr. Minagawa opines, however, that Mr. Rush is an excellent candidate for treatment. Since he has access to treatment specifically tailored for his primary issues – PTSD and depression – and an ability to attend this residential treatment without giving up a job that has been beneficial to him, it is requested that Mr. Rush be sentenced to no further incarceration and instead be ordered to attend and complete a 90-day residential PTSD program. This will not only be of value to Mr. Rush, but treatment for mental illness will also reduce the risk of recidivism. Mr. Rush's untreated mental health issues therefore warrant a variance.

//

**B. Mr. Rush's exceptional, cumulative life exposure to tragedy and trauma warrants a downward variance.**

The trauma Mr. Rush suffered through his life, and particularly during his early childhood, is another appropriate ground for variance: "it requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens." *Santosky v. Kramer*, 455 U.S. 745, 789 (1982). The fact that in the first five years of his life he was abandoned by his parents, ended up in foster care, and then bounced around between various family members who apparently did not want to care for him, would have a profound detrimental effect on anyone. For the young Jessie Rush, however, that was only the beginning of the trauma and abuse: when he finally lived with a parent in a situation that should have provided some stability, he suffered extreme physical, emotional, and psychological abuse. As noted by Dr. Minagawa, and supported by research into childhood trauma, the damage was done and his neural development was irreversibly altered. Indeed, the data shows that as a result of the various adverse childhood experiences, his lifespan will be cut short, perhaps by as much as twenty years. The consequences of such trauma and abuse therefore also support a downward variance.

**C. Mr. Rush's Military Service and Service to the Community Warrant a Downward Variance**

Courts have varied downward where the defendant's past behavior demonstrates charity, integrity, or devotion to public service. See, e.g., *United States v. Canova*, 412 F.3d 331, 358-9 (2nd Cir. 2005) (affirming six-level downward departure based on extraordinary public service and good works where the defendant, more than twenty years before sentencing, served in the Marine Corps' active reserves and as a volunteer firefighter, and more recently had acted as a "Good Samaritan" demonstrating his commitment to helping persons in distress was an

1   instinctive part of his character); *United States v. Baird*, 580 F. Supp. 2d 889, 894 (D. Neb.

2   2008) (varying down by twenty-two months in child pornography case considering, among other

3   factors, the defendant's military history in which he served in Iraq and Afghanistan and received

4   numerous commendations); *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (affirming

5   four-level departure to probation in securities fraud and tax evasion case based on defendant's

6   good work where he did not simply donate money to charity but organized and ran a youth

7   football team in a depressed area and helped members attend better schools and go to college);

8   *United States v. Warner*, 792 F.3d 847 (7th Cir. 2014) (affirming probationary sentenced where

9   tax evasion Guidelines were 46-57 months due to defendant's exceptional acts of charity and

10   demonstrated concern for the welfare of others).

11      Jessie Rush's history is replete with examples of a character committed to helping others.

12   This began as an adolescent when he recanted his history of abuse so that he would be able to

13   return to his father's home to protect his brother. It continued into high school when he joined

14   the Sea Cadets and Police Explorer's groups, and eventually enlisted in the military. After return

15   from combat and discharge from the military, he tried to save a young child from abuse. Then he

16   worked as a paramedic and firefighter, and thereafter in private security. As outlined above, in

17   the PSR, and in Dr. Minagawa's report, all this service to his country, community, and others

18   came at a high cost to Mr. Rush: he is severely damaged and will need years of treatment to

19   process and address this damage and trauma.

20      This history of service therefore warrants the small variance requested.

21   **D.  Mr. Rush's employment history and compliance on supervision warrants a variance**

22      A defendant's exemplary work history may also merit a variance. See, e.g., *Gall v.*

23   *United States*, 552 U.S. 38, 42 (2007) (affirming variance to probation where, post-arrest, the

24

defendant obtained a college degree and stared his own business); *United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (variance down to a year and a day from a Guidelines range of 46-57 months, citing in part defendant's "long and consistent work history" at a legitimate job); *United States v. Big Crow*, 898 F.2d 1326, 1331-2 (8th Cir. 1990) (downward departure for 23 year old defendant in an assault case based on excellent employment record since age 17 despite an unemployment rate of 72% on Indian reservation).

Mr. Rush has always worked and been productive, primarily in jobs that serve others at the expense of physical and psychological risk to himself. He has done this work selflessly to the detriment of his personal health. This employment history is yet another basis for a variance in this case.

**E. The requested sentence is consistent with sentences imposed for similar Guidelines profiles across the country**

Undersigned counsel had sentencing data compiled for sentenced defendants across the country with similar Guidelines profile characteristics to Mr. Rush. Specifically, the profiles focused on individuals whose offense levels were from the same USSG section (§2J1.2), a Criminal History Category I, with a base offense level of 14 and an adjusted offense level of 13 (an offense level two points higher than that of Mr. Rush). The sentencing results show that these defendants, whose Guidelines range are higher than that of Mr. Rush, were largely sentenced to probation or time served. (See Ex. E, Declaration of Jordan Schaer and Sentencing Analysis).[3]

---

[3] There are three profiles, as described below with the following nationwide results:
   (1) Base offense level 14 with adjusted offense level of 13: 42.74% were sentenced to probation nationwide
   (2) Base offense level 14 with adjusted offense level of 13 using the same offense enhancement as in this case (2J1.2(b)(3)(B)): 50.77% of defendants were sentenced to probation nationwide
   (3) Base offense level 14 with adjusted offense level of 13 sentenced to time served: 83.72% received probation and 90.70% were sentenced to 5 months or less (this includes the probationary sentences)

The sentence requested in this case is therefore consistent with the sentences of other defendants across the country who committed similar conduct. Indeed, given that Mr. Rush's Guidelines range is lower than that of the comparative defendants, coupled with his significant mitigating circumstances and service to his country and community, shows that the sentence requested is reasonable and appropriate, and avoids unwarranted disparity among similarly situated defendants.

## **CONCLUSION**

Given the reasons cited above, Mr. Rush respectfully requests that this Court impose a sentence that includes no further custodial time so that he can engage in intensive treatment while being able to maintain his job. He therefore requests a sentence of probation or time served, to be followed by supervision that includes as a condition that he attend and complete a 90-day inpatient PTSD program, and have his liberty limited or restricted (e.g., by home confinement or imposition of a curfew) at the discretion of Probation in a manner that enables him to keep his current job. He agrees with the remaining recommended terms of supervision outlined in the PSR.

Dated: December 28, 2021                    Respectfully Submitted:


_____/s/_____
Adam Pennella
Counsel for Jessie Rush